**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SALVADOR GARCIA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 3277** |
| | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Salvador Garcia was an Auditor in the Tax Division of the City of Chicago's Department of Revenue from 2003 until 2010. In this lawsuit, Plaintiff alleges that the City imposed unfair terms and conditions of employment, and ultimately terminated him, based on his national origin and age. Plaintiff also alleges that his suspension and ultimate termination were in retaliation for engaging in protected activities. Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; under 42 U.S.C. § 1981; and under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623. Defendant now moves for summary judgment, arguing that Plaintiff is unable to prove any of his claims. For the reasons explained here, the motion is granted.

<u>**FACTUAL BACKGROUND**</u>

Plaintiff is of Mexican national origin and was born in 1968. (Resp. to Def.'s Rule 56.1(a)(3) Statement of Undisputed Material Facts [117], hereinafter "Pl.'s 56.1", ¶ 1.) Beginning on April 1, 2003, Garcia worked as an Auditor in the Tax Division of Defendant's Department of Revenue. (Pl.'s 56.1 ¶ 18.) In his first position, as an Auditor I, Garcia's duties included interpreting ordinances, reviewing taxpayers' financial records and tax returns, and determining whether taxpayers had additional tax liability. (*Id.*) Bea Reyna Hickey, also of Mexican origin and nine years older than Plaintiff, was the Director of the Department of Revenue during Garcia's employment

there, and William Cerney, who is American and twelve years older than Plaintiff, was the Deputy Director of the Tax Division. (Def.'s Local Rule 56.1(a)(3) Statement of Undisputed Material Facts [106], hereinafter "Def.'s 56.1", ¶¶ 8-9; Cerney Dep. [118] 14:9-22, 16:5-6.)

Garcia acknowledged that the only time he explicitly revealed his national origin to those "higher up in the hierarchy" was when he completed his employment application materials. (Garcia Dep.[1] 5:8-16.) He nevertheless contends that those supervising and managing him, including Hickey, Cerney, Department Manager Rommel Pitchan, and Assistant Deputy Michael Luzzi, were aware of his Mexican origin and his age. (Garcia's Statements of Addnl. Facts [117], hereinafter "Pl.'s Addnl.", ¶¶ 3, 5.) For example, Garcia points out that he told his supervisor and other co-workers about a trip to Mexico to visit his family in July or August of 2009. (Pl.'s Addnl. ¶ 1.) He occasionally translated Spanish in the office, and he brought Mexican food to an office Cinco de Mayo celebration as an example of food from his heritage. (Garcia Dep. 310:1-24, 311:1-2; Pl.'s Addnl. ¶ 2.) Plaintiff notes, further, that the Tax Division hangs a calendar in the office that shows the month and day of employee birthdays. (Pl.'s Addnl. ¶ 4.) (Defendant asserts that the calendar did not include birth years. (Def.'s Resp. to Pl.'s Rule 56.1 Statement of Addnl. Facts [125], hereinafter "Def.'s Resp. to Pl.'s Addnl.", ¶ 4.)) Cerney testified that he did not know Garcia's age or national origin when Garcia was terminated on May 5, 2010. (Cerney Dep. 37:17-20; Pl.'s 56.1 ¶ 1.)

Garcia first felt discriminated against based on his age when he was asked to do collections work after being hired. (Garcia Dep. 167:22-24, 168:1.) The parties do not explain the distinction between "collections" and "assessments," but Garcia considered collections work a demotion. (Garcia Dep. 148:1-12.) He did not explain the basis for his belief that the collections assignment

---

[1]     Garcia Dep. refers to the February 23, 2012 deposition of Salvador Garcia, marked as Ex. A to Pl.'s 56.1, as well as the March 8, 2012 deposition of Salvador Garcia, marked as Ex. I to Pl.'s 56.1.

was based on his age, beyond asserting that he was the only person assigned to collections among approximately seven newly hired employees, at least some of whom were non-Mexican and under forty.  (Garcia Dep. 148:13-24, 149:1-17, 168:17-22, 169:9-23.)

Garcia believes national origin discrimination was the reason that he was not promoted as rapidly as less-experienced auditors who, he believes, collected less in assessments than he did in collections.  (Garcia Dep. 150:2-21, 151:1-14.)  Garcia was promoted to an Auditor II position on April 1, 2005.  (Def.'s 56.1 ¶ 21.)  Though he applied for promotion to an Auditor III position three or four times during his employment at the Department of Revenue, he was never promoted beyond the rank of Auditor II.  (Garcia Dep. 152:8-17.)  Garcia testified (without identifying the source of his information) that Robert Rachowicz, who was hired around the same time as Garcia, collected only $12,000 in assessments while Garcia collected $1 million in collections, but was promoted to Auditor II before him at some point in 2004 or 2005.  Rachowicz is of Polish national origin and was in his twenties.  (Garcia Dep. 148:13-21, 150:2-24, 151:1-5.)  Garcia also notes the promotions of Crystal Scrimgeour and Mike Kielar, both "White Americans" under age 40, to the position of Auditor III.  (Garcia Dep. 151:6-14, 152:18-21, 153:1-16.)  Garcia estimates that Scrimgeour was promoted in 2007 (Garcia Dep. 151:11-12); the record does not reveal Kielar's promotion date or Kielar's or Scrimgeour's hire dates.  Garcia acknowledged that he did not know Scrimgeour's or Kieler's work experience beyond their work in the audit division.  (Garcia Dep. 153:19-24, 154:1-3.)

Each time Garcia applied for an Auditor III position, he acted on his own initiative in response to a job announcement he saw posted "on the board."  (Garcia does not explain what "the board" is, nor to whom it is visible.)  (Garcia Dep. 152:14-17.)  In 2007 and 2008, he was interviewed for an Auditor III position by a number of person whose names he does not recall. (Garcia Dep. 151:13-24, 152:1-13.)  Audit Supervisor Mark Pekic described the promotion practice

in a general way.  (Pekic Dep.[2] 109:14-24, 110:1-24, 111:1-13.)  Neither party offered evidence concerning the process of review for Garcia's own applications for promotion.

In addition to discrimination in promotions, Garcia asserts that management made it difficult for him to complete audits by assigning him to a new manager in 2009 who required him to revise his work repeatedly (Garcia Dep. 107:2-7, 143:1-24, 306:15-22); by preventing him from traveling to complete audits in 2009 (Garcia Dep. 106:1-7, 142:14-23); by denying his request to accrue compensatory time in 2009 (Garcia Dep. 195:17-24, 196:1-24, 197:1-2); and by denying his request to roll-over more than three days of accrued vacation time to 2010 (Garcia Dep. 143:8-24, 144:1-23).  Garcia alleges, as well, that supervisors erroneously denied him leave under the Family Medical Leave Act ("FMLA") in 2010 before eventually approving the leave.  (Pl.'s Addnl. ¶ 28.)[3] He asserts that on unspecified dates co-workers lied (Garcia does not say to whom) about feeling threatened by Garcia, noting, in particular, Auditor IV Katina Drake's accusation that Garcia punched her cubicle, and Mark Pekic's assertion that Garcia blocked the doorway of Pekic's office. (Garcia Dep. 154:16-21, 171:12-24, 180:11-22, 233:12-19.)  As other evidence of discrimination and retaliation, Garcia asserts that Pekic was "antagonizing" and "harassing" toward him, including "yell[ing], scream[ing], and pound[ing] his [Pekic's] fist on the desk whenever he addresses me [Garcia]," and that Pekic called him a thief.[4]  (Garcia Dep. 154:10-13.)

---

[2]     Pekic Dep. refers to the March 27, 2011 deposition of Mark Pekic, included in the record as Ex. E to Pl.'s 56.1 and Ex. H to Def.'s 56.1.

[3]     Garcia's recollection of who decided to deny his FMLA leave request was "fuzzy" but he "believe[d] it was Romell Pitchan."  (Garcia Dep. 203:8-11.)  He was initially denied leave because someone in the Department miscalculated the hours he had worked such that he was not eligible for leave.  (Garcia Dep. 270:1-22.)  (The parties do not explain why or how the number of hours Garcia worked would affect his FMLA leave eligibility.)  The record does not specify who calculated his hours, or who ultimately approved Garcia's leave.

[4]     Garcia did not state when exactly Pekic called him a thief, but testified that it was "in front of" Pitchan in Pekic's office.  (Garcia Dep. 154:10-13, 235:19-24, 236:21-24.)  According to Garcia, Pekic called him a thief because Pekic thought he was "collecting a paycheck without
(continued...)

Garcia admits that no City employee ever made a direct derogatory comment about his national origin.[5]  (Garcia Dep. 163:11-13.)  Garcia testified, however, "there's really no conclusion that I could come up with" to explain his difficulties with Defendant "except that . . . people in the department had something against me."  (Garcia Dep. 211:7-24.)  According to Garcia, "[o]nce they [management] target you, they don't let you go.  They have like a vendetta against you, and they just keep coming wave after wave.  They don't even give you a chance to breathe sometimes, or at least that's how you feel."  (Garcia Dep. 242:21-24, 243:1.)

A.      **Performance Evaluations**

Garcia received overall ratings of "good" or "very good" on his semi-annual performance evaluations for nearly six straight years, from the second half of 2003 through the first half of 2009.  (Performance Evaluations, Ex. U to Pl.'s 56.1.)  Though the overall ratings were positive, Garcia's scores on individual performance categories were less favorable.  From 2005 until his termination in 2010, on all but one of his evaluations, Garcia was rated as less than "good" for at least one performance category and was placed on a Performance Improvement Plan ("PIP") by his supervisors.  (Performance Improvement Plans, Ex. U to Pl.'s 56.1, at GAR000820, GAR000824, GAR000804, GAR000805, D000767, D000109, D000112, D000160, D000163.)  The PIPs were aimed at various problems: four dealt with accurately computing tax liability, "[f]ormulat[ing] a sound audit approach," or the quality of submitted work; four dealt with preparing workpapers in accordance with guidelines; four dealt with complying with Department policies and procedures; three dealt with spending insufficient time "in the field" while completing audits; one dealt with the

---

[4](...continued)
being productive."  (Garcia Dep. 235: 6-12.)  Pekic denies having called Plaintiff a thief.  (Def.'s Resp. to Pl.'s Addnl. ¶ 29.)

[5]      Garcia testified that there was a comment made by several individuals that was not "[r]eally derogatory."  He stated he did not know what the comment was, or when it was made, but it was "something about bean something."  (Garcia Dep. 163:11-24, 164:1-8.)

number of "tax types completed"; and four dealt with improving Garcia's attitude. (Performance Improvement Plans.) Garcia refused to sign six of the nine PIPs because he disagreed with his supervisors' evaluations of his performance. (Garcia Dep. 71:17-20, 75:14-16, 76:10-14, 78:8-13, 80:3-11, 84:22-24, 85:1-6.) Neither side has explained whether Garcia completed the PIPs to his supervisors' satisfaction.

Auditor IV Elaine Herman wrote a positive performance evaluation in 2003, referring to Plaintiff as "a great asset to our unit and a pleasure to work with." (Performance Evaluations at GAR000029.) The following year, Herman noted Garcia's "good judgment" and commitment. (Performance Evaluations at GAR000829.) Things changed in 2005, however. As of April 1, 2005, Garcia's new Audit Supervisor was Pitchan, who is Filipino and the same age as Garcia. (Pl.'s 56.1 ¶¶ 10, 21.) Pitchan wrote in Garcia's evaluation for the first half of 2005 that Garcia performed below expectations in executing a "sound audit approach," in preparing and submitting workpapers, in preparing audit programs, and in complying with policies and procedures. (Performance Evaluations at GAR000818-19.) Despite this performance, Garcia was promoted to the position of Auditor II on April 1, 2005. (Pl.'s 56.1 ¶ 21)

Pitchan reiterated his critiques in Garcia's evaluation for the second half of 2005, emphasizing a need for improvement in Garcia's workpapers. (Performance Evaluations at GAR000823.) Garcia challenged this evaluation, writing in attached comments that Pitchan's assessment was "unfair, since the level of support or developmental guidance by [Pitchan] has been woefully lacking." (Performance Evaluations at GAR000821.) Garcia testified that "for whatever reason, [Pitchan] just didn't have time for me." (Garcia Dep. 72:19-20.)

Garcia began reporting to a new Audit Supervisor, Antonio Adapon, in 2006. (Pl.'s 56.1 ¶ 21.) Adapon is Filipino, and Garcia estimated Adapon's age as between 55 and 60 years old. (Garcia Dep. 20:5-10.) As Garcia's supervisor, Adapon also described workpaper problems on his evaluation for the first half of 2006. (Performance Evaluations at GAR000802-03.)

6

Adapon observed errors in tax calculation, a lack of time spent in the field, "instances that [Garcia's] audit approach were unreasonable or completely off" and "a tendency to resist policies that you [Garcia] disagree[d] with." (Performance Evaluations at GAR000802-03.) Adapon specifically warned Garcia that "recurrence [of these infractions] could result to [sic] disciplinary actions." (Performance Evaluations at GAR000802-03.)

Pitchan again described problems in Garcia's evaluation for the second half of 2006. Pitchan commented, "you [Garcia] received a large amount of clearance points[6] . . . and at times multiple rounds of corrections needed to be made." (Performance Evaluations at GAR000806.) Garcia acknowledged that it was "not very typical" for an audit to require multiple revisions.[7] (Garcia Dep. 115:16-20.) Pitchan also advised Garcia to improve his customer service in response to a taxpayer complaint:

> In my fourteen years with the Department, I have never read such feedback from a taxpayer. . . . Being stubborn, argumentative, uncooperative and unwillingness to listen are [a] few of the issues she had with your conduct. . . . [A] discussion between your supervisor, Antonio Adapon, yourself and I seemed to substantiate the allegations made by the taxpayer.

(Performance Evaluations at GAR000806.) Assistant Deputy Michael Luzzi, who is "white American" and "between 50 and 55," added his own comments to Garcia's 2006 evaluation. (Garcia Dep. 19:21-24, 20:1-4.) Luzzi noted Garcia's "poor attitude, unprofessional behavior, stubbornness, and overall hostile nature" and referenced "previous discussions with you [Garcia] involving your immature behavior and discourteous treatment of supervisors as well as your insubordination." (Performance Evaluations GAR000811.)

---

[6] Clearance points are "corrections that they [audit supervisors] wanted us to do." (Garcia Dep. 52:7-21.)

[7] For example, Hickey later wrote to Garcia in a "discharge consideration notice" that his work on the Real Time Systems audit, which required six rounds of revisions, and his work on the Down Town Parking audit, which required at least four rounds of revisions, "was of very poor quality." (Discharge Consideration Notice, Ex. N to Pl.'s 56.1, at D000037.)

Garcia disputed Pitchan's comments on his evaluation for the second half of 2006, writing that Pitchan's statements were inaccurate, that judgments about his workpapers reflected a "subjective evaluation," and that his lack of time in the field was "beyond my control." (Performance Evaluations at GAR000808.) Garcia characterized the taxpayer's complaints about his customer service as "slanderous accusations" and added that the customer had made threats to intimidate him. (*Id.* at GAR000809.) What his supervisor might deem stubbornness was, in Garcia's estimation, simply tenacious effort to protect the City's interest when his supervisor's interpretation was mistaken. (*Id.* at GAR00081.)

Charles Brown replaced Adapon as Garcia's supervisor in 2007. (Garcia Dep. 54:12-15.) Brown is "Afro-American," and Garcia estimated Brown's age as 50. (Garcia Dep. 20:18-19, 21:3.) In Garcia's evaluation for the first half of 2007, Brown wrote that he needed to improve in the "Teamwork/Leadership" category. Brown added, "we had many conversations in regard to various audit procedures you were not following" during the period. (Performance Evaluations at D000765.) Garcia's overall score for the period was 3.1 out of 4.0. (*Id.* at D000762.) There was some improvement in Garcia's evaluation for the second half of 2007; Brown gave him an overall score of 3.3 and wrote, "You did a much better job following the various audit procedures . . . Good work!" (*Id.* at D000762, D000768.) Garcia nevertheless refused to sign this evaluation because Brown "put something . . . about I [Garcia] had to improve my attitude" that he "didn't agree with." (Garcia Dep. 85:1-6.) The same day that Garcia refused to sign the evaluation, January 31, 2008, Garcia e-mailed Hickey requesting a review of his file and claiming that Pitchan had been "acting like a dictator for some time now." Garcia added that he had "remained quiet for fear of being labeled incorrectly."[8] (January 31, 2008 e-mail from Garcia to Hickey, Ex. Q to Pl.'s 56.1, at D003024.)

---

[8]     What Plaintiff meant by this statement is not clear from the record.

Garcia's e-mail was forwarded, presumably by Hickey, on to Luzzi, Cerney, and Pitchan. In a response addressed to Cerney, Luzzi wrote that Garcia's behavior was "outrageous" and that permitting Garcia "to run around making false and injurious statements about management needs to stop." (January 31, 2008 e-mail from Luzzi to Cerney, Ex. Q to Pl.'s 56.1, at D003023-24.) Luzzi also wrote that he was "trouble[d]" that Garcia had asserted "that he has been discriminated against because of his race . . . [although] he does not yet indicate who he believes discriminated against him or how." (*Id.*) Luzzi noted, further, that Garcia had filed a "Violence in the Workplace" form accusing Pitchan of wrongdoing, which was later dismissed. (When these events occurred is unexplained.) (*Id.*) In a response addressed to Luzzi and Cerney, Hickey acknowledged, "I know everyone is stressed by dealing with" Garcia. (February 1, 2008 e-mail from Hickey to Luzzi and Cerney, Ex. Q to Pl.'s 56.1, at D003023.)

Garcia e-mailed Hickey again on February 27, 2008, forwarding an e-mail exchange between himself and Cerney. Garcia complained to Hickey that "the parameter[s] set" by Cerney for a meeting to discuss Garcia's 2007 performance evaluation "are not acceptable." (February 27, 2008 e-mail from Garcia to Hickey, Ex. Q to Pl.'s 56.1, at D002994.) Cerney had required that Garcia provide a "detailed explanation of the reasons you [Garcia] believe your evaluation is not an accurate reflection" of performance, but directed that Garcia limit his comments to his most recent evaluation. Cerney explicitly told Garcia that "past promotional opportunities, discrimination claims, past employee of the month awards you [Garcia] were not nominated for, your claims of being put down or your training issues . . . [and] personal attacks on any other employee" could not be discussed at the meeting, but that Cerney was "available to address each of your other concerns in a separate forum." (*Id.*)

Hickey forwarded a copy of Garcia's e-mail to Cerney, who responded to Hickey, "this guy [Garcia] is mentally unstable and looking for attention. This is not a new observation and I believe it is one shared by [Luzzi] and [Pitchan]." (February 27, 2008 e-mail from Cerney to Hickey, Ex. Q to

9

Pl.'s 56.1, at D002993.)  Luzzi also replied, observing, "I share [Cerney's] thoughts, he is a very troubled individual . . . [Garcia] is an emotional person and often acts out on his emotions." (February 27, 2008 e-mail from Luzzi to Hickey, Cerney and Pitchan, Ex. Q to Pl.'s 56.1, at D002993.)

Brown's evaluation of Garcia for the first half of 2008 again identified problems in Garcia's work.  Brown rated Garcia as requiring improvement in the "Teamwork/Leadership" category, adding, "[d]on't let your attitude overcome what I consider a very good job performance.  You must improve on your attitude!" (Performance Evaluations at D000768.)  In his evaluation for the second half of 2008, Brown again rated Garcia as needing improvement in "Teamwork/Leadership" and in preparation of his workpapers.  Brown cautioned, "you continue to be argumentative with issues with me, co-workers, the Law Department, and the taxpayers.  You need to listen more and argue less. . . . You also need to understand that because someone takes a different position than you doesn't mean they are out to get you. . . . [Y]ou have displayed the ability to do the job but your attitude clearly needs improvement." (*Id.* at D000110.)

Garcia again took issue with his performance evaluation, writing in reference to Brown's comments for the second half of 2008, "[f]or the past four years . . . I have been scrutinized and evaluated unjustly and unfairly."  He complained that his evaluations reflected his supervisors' subjective assessments, and resulted in his being "unjustly passed over" for promotions. (*Id.* at D000113-14.)  Garcia asserted that the evaluation system "must be changed in order for the rightfully deserving candidate to be chosen" for promotions. (*Id.* at D000114.)  At his deposition, Garcia explained that, in his view, the evaluation process "wasn't transparent enough, and it . . . wasn't broken down enough where you could see from each perspective where you stood." (Garcia Dep. 100:15-24.)  It bothered Garcia to hear "through the grapevine" about "individuals that were getting" higher evaluation scores, but who, in his opinion, "weren't producing half as much as what I [Garcia] was producing." (Garcia Dep. 101:5-12.)  Garcia acknowledged, however, that he never

saw the performance evaluations of co-workers and he was not sure of "the exact individuals" who received higher ratings. (Garcia Dep. 101:1-4, 14-24.)

Garcia completed sixteen audits during the first half of 2009, exceeding his goal of eleven audits and earning an overall "good" rating of 3.3 out of 4 (better than 22 of the 29 employees assessed). (Performance Evaluations at D000158; August 18, 2009 e-mail from J.C. to Cerney and Shalanda Hedrick, Ex. V to Pl.'s 56.1.) Brown wrote in Garcia's evaluation for the period, "You have clearly been one of my more productive auditors." (Performance Evaluations at D000158.) Brown also reiterated, however, that Garcia needed to improve in the "Teamwork/Leadership" category, and exhorted him: "Don't let your attitude overcome what is consider [sic] a good job!" (*Id.* at D000158.)

Mark Pekic, who is of Yugoslavian and Albanian national origin, and who is "[a]bout 30," became Garcia's supervisor in September of 2009 after Brown was demoted. (Garcia Dep. 66:21-22, 106:21-24; Pekic Dep. 25:1-9.) Things did not go smoothly. Garcia and Pekic had disagreed about the assessment of a particular tax while Garcia was supervised by Brown. After the City's law department ruled that the tax should be assessed in the way Garcia suggested, Pekic began acting "very mad and angry," according to Garcia. (Garcia Dep. 62:9-24.) Garcia testified that he "didn't think it was good for us [Pekic and Garcia] to interact" after the tax issue was decided in "my [Garcia's] favor." (Garcia Dep. 62:1-4.) According to Garcia, "different things" were asked of him by Pekic that were not asked of him by previous supervisors, such as including an "auditor's memo" in his files. (Garcia Dep. 108:4-13.) Garcia testified that a "Latino Peruvian" co-worker and an Italian co-worker, both under forty, also reported that Pekic required employees to do "extra" things compared to other supervisors, and that he was "difficult to work with." (Garcia Dep. 59:22-24, 60:13-24, 274:1-7; Pl.'s Addnl. ¶ 19.) Garcia also testified that on September 29, 2009, Pekic was "verbally abusive" toward Garcia when Pekic "pounded his desk with his fingers in an angry vocal tone stating that everyone has their own style of supervising and that this was his style!"

11

(November 18, 2009 Rebuttal, Ex. K to Pl.'s 56.1, at GAR001424.) At some point while being supervised by Pekic—the exact date is not in the record—Garcia began to believe that "there was some sabotage" in one of his files, because he found mistakes in the file that he did not believe he could have made. (Garcia Dep. 111:3-24.)

Garcia had a target goal[9] of 12 assessments for the second half of 2009, but he did not complete a single one. (Performance Evaluations at D000161.) Target goals varied based on work assignments and the progress of all auditors in a given section of the Department. (Garcia Dep. 47:10-22, 49:17-24, 50:1-18.) According to Garcia, his monthly goals for 2009 were "established without my input." (May 4, 2010 Letter from Garcia to Hickey, Ex. K to Pl.'s 56.1, at D000032.) (The record contains no evidence about whether other employees had the opportunity to offer input before their performance goals were set.) Garcia's overall evaluation rating dropped from his previous "good" score of 3.3 to an "unsatisfactory" score of 1.0 out of 4.0. (Performance Evaluations at D000153.)

Garcia attributes his inability to complete any audits during the period to obstacles created by his supervisors. Although Pekic asserts that he met with Plaintiff on numerous occasions (Def.'s Resp. to Pl.'s Addnl. ¶ 29), Garcia insists Pekic refused to meet with him to discuss Pekic's expectations for Garcia's work. (Garcia Dep. 180:3-10.) Garcia claims, further, that supervisors unnecessarily required him to revise his work over and over (Garcia Dep. 306:9-22); that supervisors prevented him from traveling to complete audits in 2009 (Garcia Dep. 106:3-7, 142:14-23); that supervisors denied Garcia's request to accrue compensatory time in 2009 (Garcia Dep. 195:17-24, 196:1-22); and that supervisors denied Garcia's request to roll-over more than three days of accrued vacation time to 2010. (Garcia Dep. 143:8-24, 144:1-2.) Garcia also complained that Pekic did not allow him to complete assessments "on a piecemeal basis," moving forward with one portion of an

---

[9] The parties do not say how this particular goal was set, when it was set, or how it compared with the target goals set for other auditors.

assessment while other portions were being reviewed, although it was a "courtesy . . . extended to others under [Garcia's] previous supervisor." (Garcia Dep. 128:1-20.)

On February 4, 2010, Pekic e-mailed Garcia and complained that "you [Garcia] have continually made careless errors on your timesheets." (February 4, 2010 e-mail from Pekic to Garcia, Ex. Q to Pl.'s 56.1, at D001997-98.) Garcia replied, "I don't know what you are referring to[;] as to your remarks they continue to be unfriendly and intimidating in nature. I will file a vioience [sic] in the work place if you continue to disresect [sic] me." (*Id.* at D001997.) Pekic forwarded Garcia's reply to Pitchan and Cerney, who forwarded Pekic's e-mail to Hickey, Managing Deputy Phillip Cobb, Pitchan, and Deputy Director of Finance Administration Cynthia Park. Cerney wrote, "[i]t appears that every time we interact with [Garcia] he will retaliate with a charge or threat as his termination is the next disciplinary step." Cerney closed by asking, "How long before [Garcia] plays the discrimination card?" (*Id.* at D001996.)

Pekic again criticized Garcia's performance for the second half of 2009 in evaluation comments dated February 17, 2010. Pekic wrote:

> Your performance and behavior during the rating period exhibited serious deficiencies…Your poor work and insubordinate attitude . . . greatly contributed to you not completing any work during the rating period. . . . You have no one to blame for this poor grade but yourself and . . . you need a drastic attitude adjustment.

(Performance Evaluations at D000161.) Pekic also wrote that Garcia's work in some cases exhibited "[a] glaring lack of quality." (*Id.* at D000162.) In closing, Pekic criticized Garcia for making unidentified "potentially harmful, unfounded and reckless accusations." (*Id.*)

Garcia responded to Pekic's evaluation comments on February 24, 2010, writing that review of his files was "stalled due to circumstances beyond [his] control" and that his "productivity during this period has been detrimentally impacted by management changes and unwarranted disciplinary actions" against him. (*Id.* at D000164.) Garcia denied he had ever been belligerent or insubordinate, and complained that Pekic had never provided any "genuine assistance." To the

contrary, Garcia asserted that his requests for help "were treated as a nuisance, greeted with impatience and rude remarks." (*Id.* at D000164.) Garcia also asserted that his productivity was compromised by Pekic's "micromanaging." (*Id.* at D000165.) Garcia concluded his comments by complaining that "not one of my concerns ever in the seven years I have worked here has ever been accepted by upper management" and that "management [is] . . . steadfast to be an obstacle in my progress, to deny, to derail, to discredit, and continually to discriminate against me." (*Id.* at D000166.) Plaintiff asserts that he complained about discrimination to his managers in 2008, 2009, and 2010. (Pl.'s Addnl. ¶ 30.) He verbally complained about national origin discrimination to "management," namely Cerney and Luzzi, at some unspecified time. (Garcia Dep. 165:17-23, 166:11-24, 167:4-12.) Garcia also testified that he made discrimination claims in his written comments on his performance evaluations (Garcia Dep. 165:13-16); as the court reads these comments, however, they do not in fact allege that unfair treatment of him was based on his national origin or age. (Performance Evaluations, Ex. U to Pl.'s 56.1.)

On March 23, 2010, Pekic declined to award a one-step salary increase Garcia was scheduled to receive, citing Garcia's failure to meet work standards. (Employee Salary Increment Form, Ex. W to Pl.'s 56.1, at D000089.) A week later, Garcia e-mailed a work unit that the parties refer to as "Integrity," asserting that "racial discrimination is rampant" in the Department. (April 1, 2010 e-mail from Garcia to Integrity, Ex. Q to Pl.'s 56.1, at D003343.) Garcia also alleged in a letter to Hickey that Pekic was "calculated in waiting to complain about my productivity and performance until the time that my merit increase would come due for approval to provoke me." (May 4, 2010 Letter from Garcia to Hickey, Ex. K to Pl.'s 56.1, at D000032.) He made no reference in the letter to the treatment of younger workers or workers whose national origin was not Mexican.

### B. Disciplinary Action

In addition to the criticisms expressed in his performance evaluations, Garcia received formal discipline on several occasions, beginning at least as early as May 2006. At that time, Garcia was formally reprimanded for an episode the previous month in which he allegedly refused to re-write a travel expense statement as requested, raised his voice, and called Adapon, his Audit Supervisor at the time, a "jerk." (City of Chicago Written Reprimand, Ex. A to Def.'s 56.1, at D000143.) The written reprimand cited violations of Personnel Rule sub-sections 23 (discourteous treatment), 25 (insubordinate actions), 33 (interfering with others on the job), and 50 (conduct unbecoming a public employee). (*Id.*) Garcia's version of events is that he "disagreed" with Adapon because he was originally told his travel expense would be approved, but it was denied after Adapon changed the reimbursement rules. (Garcia Dep. 30:14-21, 292:10-24.) According to Garcia, he "may" have raised his voice in that discussion, but "it was mutual." (Garcia Dep. 293:4-5.) Garcia also challenged Adapon's assertion that the travel statement was illegible, though, according to him, he did not refuse to re-write the form: he merely "ask[ed] [Adapon] for a clarification on what he wanted me to rewrite. Because, to me, it was legible." (Garcia Dep. 293:6-21.) On another occasion, Garcia testified, Adapon "raised his voice, and thr[ew] the audit report that I [Garcia] created at me," although he could not recall the circumstances or date when that happened. (Garcia Dep. 31:11-21.) Garcia offered no evidence of Adapon's treatment of other workers in similar circumstances.

Garcia was suspended for one day in April of 2009 by Managing Deputy Phillip Cobb for (1) failing to attend a meeting called by Cobb with members of the personnel group to address concerns about why Garcia had not received a promotion, and (2) allegedly providing misleading information about why he failed to attend. (April 2009 Notice of Progressive Discipline, Ex. A to Def.'s 56.1, at D000012-13.) Garcia was cited for violating Personnel Rule sub-section 25 (insubordinate actions). (*Id.*) Garcia testified that his failure to attend was a mistake. According

15

to him, he replied to an e-mail invitation for the meeting from Director of Personnel Policies Shalanda Hedrick and stated that he could not attend at the proposed time. Since he never received a "follow up e-mail," he assumed the meeting would not take place. (Garcia Dep. 295:1-19.) Garcia admitted when he later discussed his failure to attend with Cobb at a pre-disciplinary hearing, "it got a little loud." (Garcia Dep. 296:9-21.)

Garcia was again suspended for three days in June of 2009 by Pitchan for allowing a tax collection deadline to lapse without making a demand on the taxpayer in April of 2009. (June 2009 Notice of Progressive Discipline, Ex. A to Def.'s 56.1, at D000010-11.) The disciplinary notice cited violations of Personnel Rule sub-sections 38 (inattention to duties), 39 (performance below expectations), and 48 (protecting statute periods). (Id.) Garcia testified that the missed deadline was his supervisor Brown's responsibility.[10] (Garcia Dep. 301:13-24, 302:1-7.)

Garcia's disciplinary history worsened once he was placed under Pekic's supervision in September of 2009. In November of that year, Pekic imposed a 15-day suspension[11] on Garcia for "verbally abusive, threatening and intimidating" behavior toward Pekic, for insubordination, and for giving "misleading and dishonest answers" when questioned "on the specifics of these incidents" on August 28, September 29, and October 9 of 2009.[12] (November 2009 Notice of Progressive Discipline, Ex. A to Def.'s 56.1, at D000014-15; Pekic Dep. 98:8-13.) The notice cited violations of Personnel Rule sub-sections 23 (discourteous treatment) and 25 (insubordinate actions). (Id.) At some point before November 18, 2009, Garcia was also accused by Drake of punching her

---

[10]     For his part, Brown evidently chose to put the incident behind him. Brown wrote of the mistake in Garcia's subsequent performance evaluation that "[w]e have discussed this matter in depth and I don't expect this to be a problem again." (Performance Evaluations at D000158.)

[11]     The 15-day suspension was reduced to 10 days on May 24, 2010 through a City of Chicago Contract Grievance Form submitted by Garcia and evaluated by a Level III Hearing Officer. (Fifteen Day Suspension Grievance Form, Ex. A to Def.'s 56.1.)

[12]     The details of the incidents referred to are not in the record.

cubicle or "slamming the back of a cabinet or a credenza or something around her." (Cerney Dep. 39:6-19; November 18, 2009 Rebuttal, at GAR001426.)

On January 7, 2010, Garcia was suspended for 29 days[13] for "continu[ing] to exhibit behavior that is hostile, abusive, threatening and intimidating" toward his "supervisor, Manager, Deputy, and fellow co-workers" on October 16, October 19, October 30, November 2, and November 6 of 2009. (January Notice of Progressive Discipline, Ex. A to Def.'s 56.1, at D000016-17.) The record does not specify what exactly occurred, but the suspension notice described Garcia as "insubordinate by not following the orders of his supervisor and refus[ing] to leave the Audit Manager's office when directed." The notice also stated that Garcia provided "misleading and dishonest answers" when he was questioned about the incidents. (*Id.*) The notice cited violations of Personnel Rule sub-sections 20 (retaliation against an employee who has filed a grievance), 23 (discourteous treatment), 25 (insubordinate actions), and 50 (conduct unbecoming a public employee). (*Id.*; Personnel Rules, Ex. C to Def.'s 56.1, at D000656.)

Garcia wrote in a November 18, 2009 rebuttal[14] that "[o]n October 16, 2009 Mark Pekic accuses me of demanding [a] file back twice from him. I did not demand the file." (November 18, 2009 Rebuttal, at GAR001423.) Garcia maintains that he simply asked Pekic to allow him to begin revising one portion of the file while Pekic continued reviewing the rest. (*Id.*) Garcia also denied that he told Pekic, "this [that is, revision of the file] is why you and I are going to have problems," or that he threatened Pekic. (*Id.*) Garcia further denied that he "went on a tirade that my coworkers are out to get me," denied that he "rose from my chair and pointed to [Pitchan's] office" on October 16, 2009, and denied that he "glare[d]" at Pekic in a way that left

---

[13]     The 29-day suspension was later reduced to 24 days on May 27, 2010 through a City of Chicago Contract Grievance Form submitted by Garcia and evaluated by a Level III Hearing Officer. (Twenty Nine Day Suspension Grievance Form, Ex. A to Def.'s 56.1.)

[14]     The record is silent as to whom the rebuttal was addressed or its context.

Pekic "deeply disturbed" on October 19, 2009. (*Id.* at GAR001424-25.) Garcia also denied that he warned Pekic he would "continue to glare at him" on November 2, 2009. (*Id.* at GAR001425.) Garcia complained that Drake was "participating in the slanderous campaign against me," and that he "did not pound a fist on [Drake's] cubicle." (*Id.* at GAR001426.) Nor did Garcia "block[] [Pekic's] access to the doorway" in an office on October 9, 2009, as he claimed Pekic alleged. (*Id.* at GAR001427.) In addition, Garcia denied other allegations made by co-workers that are difficult to discern from the record. (*Id.* at GAR001426-27.)

Garcia filed a charge with the Equal Employment Opportunity Commission ("EEOC") on January 19, 2010 ("January Charge"), alleging he was "subjected to different terms and conditions of employment, scrutiny, discipline, and suspension than younger, non-Hispanic employees" in violation of Title VII and the ADEA. (January Charge, Ex. H to Pl.'s 56.1.) On February 4, 2010, Garcia filed a second charge with the EEOC and the Illinois Department of Human Rights (IDHR) claiming that his 15-day and 29-day suspensions were based on his national origin and age, as was his alleged harassment by Pekic. (February 4 Charge, Ex. H to Pl.'s 56.1.)

On February 5, 2010, Garcia returned from his 29-day suspension and found, on his office chair, an envelope from the IDHR containing a copy of Plaintiff's January Charge. The envelope had been opened and stapled shut, and Garcia could not identify who opened the envelope. (Garcia Dep. 171:1-4, 214:3-6.) Garcia asserts that Cerney was aware of the envelope's contents and retaliated against him for filing his January Charge.[15] (Garcia Dep. 174:12-22, 175:3-23.) Garcia testified that an unidentified IDHR employee told him in an unidentified communication that his supervisors, including Cerney, knew he filed a discrimination charge against them. (Garcia Dep. 175:3-23.)

---

[15]     As evidence that Cerney "must have seen [the charge in the envelope] as well," Garcia simply noted that "the mail's been opened, and stapled shut." (Garcia Dep. 174:12-14.)

Cerney called Drake, Pitchan, Pekic, and Garcia into a meeting in his office that same day to tell them that investigation of a "Violence in the Workplace" form filed by Drake about Garcia concluded that the charges were unsustained.[16] (Garcia Dep. 173:6-11.) Cerney asked Garcia if he would be able to work with Drake, and Garcia testified that he responded affirmatively. (Garcia Dep. 173:14-22.) According to Garcia, Cerney became "irate" for unspecified reasons. (Garcia Dep. 173:18.) When Garcia informed Cerney that Cerney was intimidating him, Cerney responded that Cerney "d[idn't] care," according to Garcia. (Garcia Dep. 173:23-24.) Drake had her own complaints about the way Cerney handled the meeting. She recalled that Garcia did say he could work with her, but Cerney interrupted Garcia and told him that "[y]ou [Garcia] bore me [Cerney]." (Violence in the Workplace Incident Report by K.D. [127] at D001077.) According to Drake, after Garcia left the room, Drake "began to tear up" and told Cerney that she "fear[ed] for [her] life" after being threatened by Garcia, but Cerney insisted that Drake continue working with Garcia. (*Id.*)

On February 11, 2010, Garcia filed a third charge with the EEOC and IDHR, alleging that, by issuing a disciplinary warning on February 5, 2010, Cerney had harassed him based on his national origin and age and in retaliation for his involvement in protected activities. (February 11 Charge, Ex. H to Pl.'s 56.1.) As protected activities, the charge identified Garcia's 2008 testimony in support of co-worker Derrick Mitchell in Mitchell's discrimination charge against Defendant with the IDHR on or around April 1, 2008, and his own January 19, 2010 EEOC charge. (*Id.*)

On April 22, 2010 Hickey notified Garcia that his discharge was under consideration. Hickey cited Garcia's 2009 performance evaluation and violations of Personnel Rule sub-sections 23 (discourteous treatment), 25 (insubordinate actions), 29 (failing to take action as

---

[16]    Descriptions of what a "Violence in the Workplace" form is, who investigates such a complaint, or how it is resolved, are not in the record. Nor does the record provide details concerning the date or content of the particular form referenced here.

needed), 33 (interfering with others on the job), 39 (incompetence or inefficiency in performance), and 50 (conduct unbecoming a public employee). (Discharge Consideration Notice at D000035-37.) The first sentence of the explanatory comments noted Garcia's "fail[ure] to complete *any* assessments" during the second half of 2009, and Hickey described several audits "of very poor quality" Garcia submitted that required as many as six rounds of revisions. (*Id.* at D000037) (emphasis in original). Hickey commented, further, that Garcia "continued [after his 29-day suspension] to exhibit rude and/or discourteous and/or confrontational and/or intimidating behavior towards others in the work place, thereby disrupting the work environment." (*Id.*)

On May 4, 2010, Garcia wrote to Hickey responding to "the allegations made against [him]." (May 4, 2010 Letter from Garcia to Hickey, Ex. K to Pl.'s 56.1, at D000029.) He argued that his reduced productivity was "entirely attributable to management's actions," such as Pekic's refusal to provide "meaningful guidance" and to meet with Garcia monthly. (*Id.*) He complained that his supervisor never raised the issue of his productivity before the performance review process in March, including at pre-disciplinary hearings that were held for him. (*Id.*) He also disputed that changes requested by Drake as a reviewer of the Real Time Systems file or by Auditor IV Randi Stewart as reviewer of the Downtown Parking file—both files mentioned by Hickey as requiring many rounds of edits—were appropriate. (*Id.* at D000030-31; Discharge Consideration Notice at D000037.) He again denied Drake's allegation that he hit something in her office. (May 4, 2010 Letter from Garcia to Hickey at D000031.) Last, Garcia complained about "[m]anagement, and in particular . . . Pekic," noting that "[t]heir previous attempts to discipline me through other avenues beyond this present process, which is partial and biased, have been unsuccessful." (*Id.* at D000031-32.)

Based in part on a recommendation from Pekic, Hickey terminated Garcia on May 5, 2010. (Discharge Letter, Ex. G to Pl.'s 56.1; Pekic Dep. 102:6-14.) Cerney testified that he also recommended that Garcia be discharged because "he [Garcia] was misbehaving and he wasn't

performing his job . . . [a]nd it was kind of a cumulative thing that . . . he wasn't interested in being disciplined and continuing work." (Cerney Dep. 122:8-18.)

Two weeks after Garcia was discharged, on May 20, 2010, he filed his fourth charge with the EEOC, alleging that he was terminated in retaliation for filing his previous charges with the EEOC and IDHR. (May Charge, Ex. H to Pl.'s 56.1.) Though he acknowledges that he did not inform Cerney, Pekic, or Hickey of his earlier charges, Plaintiff maintains that Hickey, Cerney, Luzzi, and Pekic were aware of them before his termination. (Garcia Dep. 176:4-6, 179:17-19, 214:13-15, 226:9-11.) As noted earlier, Garcia asserts that an IDHR representative told him they knew of his charges; Garcia also cites the envelope he found on his chair as evidence that someone had seen his January charge. (Garcia Dep. 175:3-23, 213:18-24.) In addition, Garcia relies on a March 31, 2010 e-mail from Labor Relations Supervisor Sheila Pierre to Hickey, referring to a settlement offer Garcia had made to the Department concerning unspecified EEOC complaints. (March 31, 2010 e-mail from Pierre to Hickey, Park, and Hedrick, Ex. T to Pl.'s 56.1.) The EEOC and IDHR have issued "right to sue" letters with respect to all four of Garcia's charges, and all are before the court in this lawsuit. (EEOC Right to Sue letters, Ex. H to Pl.'s 56.1; Charge Notices of Dismissal, Ex. H to Pl.'s 56.1.)

### C.    Comparative Treatment of Other Employees

Garcia has identified twelve employees not of Mexican origin, and ten employees under age 40 who, he contends, were treated more favorably than he was in that they received a lesser disciplinary sanction for violating the same Personnel Rule sub-section. (Pl.'s Resp. To Def.'s Mot. for Summ. J. [112], hereinafter "Pl.'s Resp.", at 12-13.) Specifically, Garcia claims he received a three-day suspension for his first violation of sub-section 39 (performance below expectations), and was then terminated for the second violation. (Pl.'s Addnl. ¶ 22.) Garcia claims another employee who violated sub-section 39 six times received a number of disciplinary suspensions, but was not discharged. (Discipline Spreadsheet [127] at 2.) The court notes that Garcia's discharge notice

cites not only his violation of sub-section 39, but also violations of sub-sections 23, 25, 29, 33, and 50 (Discharge Consideration Notice at D000035-37), and that a spreadsheet[17] cited by Plaintiff himself lists his violations of sub-sections 20, 23, 25, 38, 48, and 50 on other occasions. (Discipline Spreadsheet at 2.)

Former Department employee Derrick Mitchell, who is "Afro-American" and six years younger than Garcia, testified that management "[a]bsolutely" favored Caucasians with respect to discipline. (Garcia Dep. 38:10-11; Mitchell Dep., Ex. J to Pl.'s 56.1, 58:3-6, 61:1-24, 213:1-2.) Mitchell testified that "African Americans, people of color, [and] Hispanics" saw "the disparity within the department." (Mitchell Dep. 87:1-6.) Specifically, Mitchell testified that he overheard Drake, who he describes as "Caucasian," yelling at Brown and Pekic in 2007, although he could not recall exact dates. (Mitchell Dep. 58:11-24, 59:1-21, 61:5-14.) According to Mitchell, Drake has "never been disciplined for insubordination behavior acts," even when, on one occasion, Drake "slammed the telephone down" while speaking to either Brown or Pekic.[18] (Mitchell Dep. 58:11-15, 60:10-24.) Garcia similarly testified that he witnessed a fellow employee, Jennifer Booth, yelling at Cerney and slamming a door, but she was not reprimanded. (Garcia Dep. 244:15-19, 245:1-17.) (Garcia did not state when this took place, or how he knew she was not reprimanded.) Booth is "White American" and in her thirties. (Garcia Dep. 206:1-4.)

Garcia denies all of the misconduct cited by Defendants as reasons for his termination. (Pl.'s Addnl. ¶ 10.) According to Garcia, the discipline he received from supervisors, and his termination itself, were the products of discrimination and retaliation. He contends that similarly-situated employees who are not of Mexican national origin or who are under 40 were not disciplined as severely for engaging in substantially the same alleged conduct. (Compl. ¶¶ 48, 51, 54, 57-58.)

---

[17]    How the spreadsheet was created is not specified in the record.

[18]    The record is silent as to who chose not to discipline Drake or how Mitchell knew she was not disciplined.

Garcia further asserts that the disciplinary measures used against him were inconsistent with the past practice of the Defendant and with the terms of the Collective Bargaining Agreement governing the relationship between employees and the Defendant. (Compl. ¶¶ 47, 50, 53, 56.)

## DISCUSSION

A motion for summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The function of summary judgment is not to determine the truth of the matters presented in a case, but to determine whether there is a genuine issue for trial and "to isolate and dispose of factually unsupported claims." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (quoting *Albiero v. Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001)). The court views the facts and draws all reasonable inferences in favor of the non-moving party. *Naficy v. Illinois Dept. of Human Servs.*, No. 11-2144, ___ F.3d ___, 2012 WL 4070115, *3 (7th Cir. Sept. 18, 2012). The nonmoving party may not rely on "bare allegations" unsubstantiated by specific evidence, however, to establish a genuine factual dispute. *Smith v. Potter*, 445 F.3d 1000, 1006 (7th Cir. 2006); *Karazanos v. Navistar Intern. Transp. Corp.,* 948 F.2d 332, 337 (7th Cir. 1991) ("[A] plaintiff's speculation in not a sufficient defense to a summary judgment motion."). Summary judgment may be appropriate when "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court considers the pending motion with these standards in mind.

### A. Title VII, ADEA, and § 1981 Discrimination

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e–2(a)(1). Section 1981 similarly prohibits discrimination in employment on the grounds of race. 42 U.S.C. § 1981(a). The ADEA

prohibits such discrimination based on age. 29 U.S.C. § 623(a)(1); *see also* 29 U.S.C. § 631(a) (limiting protections to individuals over forty).[19] The same liability analysis for national origin discrimination claims under Title VII governs § 1981 race discrimination claims and ADEA age discrimination claims. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 n.4 (7th Cir. 2003).

### 1. Timeliness of Plaintiff's Claims

Defendant argues that Plaintiff's assignment to collections work in 2003, denial of promotion to Auditor II in 2004 or 2005, and denial of promotion to Auditor III in 2007 and 2008 are not actionable under Title VII because they were not the subject of a charge filed with the EEOC within 300 days of the alleged discriminatory act, as required by 42 U.S.C. § 2000e–5(e)(1). (Def.'s Mem. of Law in Support of its Mot. for Summ. J. [105], hereinafter "Def.'s Mem.", at 2-4.) The court agrees. With respect to any discrete act of discrimination, such as denial of promotion or assignment to collections work, Plaintiff may seek relief in this court only if he filed a charge within 300 days of the alleged wrongdoing. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Alleging discrete acts within the statutory period does not make acts that fall outside the statutory period timely. *Id.* at 115 ("All prior discrete discriminatory acts are untimely filed and no longer actionable."). Any discrete discriminatory acts that Defendant committed more than 300 days before Plaintiff's first EEOC charge on January 19, 2010 are therefore not actionable under Title VII.

In this case, however, Plaintiff also alleges a claim of national origin discrimination under § 1981. *See Pourghoraishi v. Flying J., Inc.*, 449 F.3d 751, 756-57 (7th Cir. 2006) (prohibition on race discrimination in § 1981 extends to discrimination based on ancestry or ethnic characteristics). Claims under § 1981 are governed by a four-year statute of limitations, rather than a 300-day

---

[19] The parties only perfunctorily mention Plaintiff's age discrimination claim in their briefs, and the court agrees that the claim appears to have little merit. The court therefore concentrates its analysis on Plaintiff's national origin discrimination claim.

charge-filing requirement. Any discrete acts forming the basis for Garcia's § 1981 action must have occurred within four years of the date of the lawsuit, in this case on or after May 27, 2006–making at least some of his failure-to-promote claims actionable. 28 U.S.C. § 1658; *see, e.g., Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004).

Plaintiff responds that, regardless of when they occurred, all of the "discrete acts" of discrimination he alleges are properly before the court, because they are all part of a larger pattern evidencing a hostile work environment. (Pl.'s Resp. at 4, 6.) Hostile work environment claims, by "[t]heir very nature," involve repeated conduct that "cannot be said to occur on any particular day." *National R.R.*, 536 U.S. at 115. Each single act of harassment need not be actionable on its own; hostile work environment claims are based on the cumulative effect of individual acts, which together constitute one unlawful employment practice. *Id.* at 116-17 (citing 42 U.S.C. § 2000e–5(e)(1)). A court may therefore consider acts which contribute to a hostile workplace claim that did not occur within the statutory filing period, because all of the acts together form one "unlawful employment practice." *Id.* at 117. But Plaintiff is wrong to argue that the discrete acts he does allege–such as denial of promotion–are actually hostile work environment claims. Plaintiff is free to use any past incidents as evidence that incidents within the statutory period were unlawfully motivated, but he cannot otherwise seek relief for those past episodes.

This court need not parse which discrete acts of discrimination, if any, occurred within the relevant dates, because, as explained below, even if all of Plaintiff's discrimination claims are actionable, they fail on their merits.

### 2.    Discrimination Under the Direct Method

A plaintiff can support a discrimination claim by offering evidence under either the direct method or indirect method. *Naficy*, 2012 WL 4070115 at *3. The direct method requires a plaintiff to show through direct or circumstantial evidence that his employer's decision to take an adverse employment action against him was motivated by discriminatory animus. *Id.* at *4. An adverse

employment action must be more than a mere inconvenience; it "significantly alters the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (difficult work assignments, less favorable evaluations, and denial of leave requests not adverse actions sufficient to support claims of discrimination under ADEA or retaliation under Title VII).

Defendant contends that only Garcia's 3-day, 15-day, and 29-day suspensions and his termination qualify as adverse employment actions. (Def.'s Mem. at 5-7.) Plaintiff replies that his 1-day suspension; his "unsatisfactory" evaluation for the second half of 2009; the "aggressive behavior, insults, demeaning remarks, and name-calling" he endured on various, and often unspecified, dates; and the City's discretionary denials of compensatory time, rolled-over vacation time, and out-of-town travel, all qualify as adverse employment actions. (Pl.'s Resp. at 6-7.)

Harder work assignments, additional responsibilities, negative performance evaluations, unfair reprimands, and refusals to grant a preferred vacation schedule, without more, ordinarily do not constitute adverse employment actions. *Griffin*, 356 F.3d at 829. Similarly, a supervisor's general hostility which creates an unpleasant environment falls short of an adverse employment action unless the hostility is severe and pervasive. *Id.* Here, as in *Griffin*, a negative performance evaluation, alleged hostility from supervisors, and denial of requests such as vacation time are not adverse actions under a discrimination analysis. The fact that each of Defendant's actions may have contributed to an escalating conflict between Plaintiff and Defendant does not mean each action can be categorized as an adverse employment action. Similarly, any effort to establish that Defendant's failure to promote Plaintiff was an adverse employment action fails completely because Plaintiff has presented no details about those decisions; that is, he has not identified the person[s] who decided not to promote him, the person[s] who were promoted instead, the qualifications of the successful applicant[s], or when the decisions were made. The court therefore agrees with

Defendant that only Garcia's 3-day, 15-day, and 29-day suspensions and his termination qualify as adverse employment actions under a discrimination analysis.[20]

Direct evidence of discrimination "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers v. Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)). Plaintiff Garcia has no direct evidence of discrimination. He argues instead that he has constructed a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 779 (7th Cir. 2006). Circumstantial evidence pointing to intentional discrimination includes: (1) suspicious timing, ambiguous statements, and behavior towards other employees; (2) evidence that similarly situated employees were treated differently, which need not be statistically rigorous; and (3) evidence that a qualified employee was passed over for promotion and that an employer's reason for differential treatment is a pretext for discrimination. *Volovsek*, 344 F.3d at 689-90.

Plaintiff offers nothing in the way of suspicious timing or ambiguous statements suggesting discriminatory animus. Indeed, Defendant disputes that anyone in Plaintiff's chain of command knew he belonged to a protected class. The court questions whether Plaintiff's supervisors were genuinely unaware that a person of the name Salvador Garcia is of Hispanic origin, but supervisors' mere knowledge of Plaintiff's national origin or age is not evidence of discrimination on that basis. *See Hobbs v. Chicago*, 573 F.3d 454, 462 (7th Cir. 2009) (employer's awareness that plaintiff was part of a protected class is "obviously not enough to cast doubt on that employer's proffered reason" for adverse employment actions) (internal quotation marks and citations omitted). Plaintiff's case is distinguishable from *Phelan*, where a plaintiff endured numerous gender-related comments from

---

[20] The test is more generous for retaliation claims; the court's analysis of Plaintiff's retaliation claims is presented below. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006); *Volovsek v. Wisconsin Dept. of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 688 n.5 (7th Cir. 2003).

supervisors and co-workers as well as multiple assaults. 463 F.3d at 781. Plaintiff's case is also unlike *Volovsek*, where a plaintiff heard a clearly derogatory gender-related remark close in time and in substance to the challenged decision not to promote her. 344 F.3d at 690. Here, Plaintiff offers no evidence that the reprimands, negative evaluation comments, or discipline he experienced had any connection to his membership in a protected class. Plaintiff admitted that he could "not really" recall any derogatory comment made by any City employee. (Garcia Dep. 163:11-13.)

As additional circumstantial evidence, Plaintiff notes Defendant's failure to promote him; denial of his requests to roll-over vacation time; denial of his requests to accrue compensatory time; denial of his requests to travel out-of-town; and the severity of his disciplinary outcomes, in contrast with the disciplinary outcomes of other employees. Yet Plaintiff has not identified any similarly situated non-Mexican or younger worker treated more favorably than him by the same supervisor. Thus, most of the incidents he complains of are not part of any mosaic: Plaintiff has not presented meaningful evidence that his denials of promotion, for example, were improperly motivated at all. He admits that he does not know all of the qualifications of those who were promoted instead of him, and merely points to alleged and largely unspecified differences in the amount of money he claims was brought in for the City by himself and other auditors. An employee's belief that promotions should be made based on the measure at which he purportedly excels does not transform the promotion process into a discriminatory one. *See, e.g., Naficy*, 2012 WL 4070115 at *4 (selection of Spanish speaker over more senior multilingual employee who did not speak Spanish for social worker position not evidence of discrimination); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (promotion of employee with prior experience who employer reasonably believed was better qualified than plaintiff not evidence of discrimination).

Plaintiff's attempt to argue that denying him a promotion casts a pallor of discrimination over a litany of subsequent complaints about Defendant, such as the denial of compensatory time, does

not create a convincing mosaic either. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("unsupported speculation" that employee's treatment was motivated by racial animus not enough to avert summary judgment). Notably, Plaintiff appears to believe that the real reason Pekic treated him badly is that he had bested Pekic in an earlier dispute about a tax assessment. But assuming this is true, Pekic's alleged resentment of Garcia has nothing to do with Garcia's national origin or age. Any effort to establish discrimination under the "direct method" fails.

### 3.    Discrimination Under the Indirect Method

Under the indirect method, a plaintiff may establish a *prima facie* case for discrimination by showing (1) membership in a protected class; (2) job performance that met the employer's legitimate expectations; (3) a materially adverse employment action; and (4) more favorable treatment by the employer of similarly situated employees outside the protected class. *Atanus v. Perry*, 520 F.3d 662, 672-73 (7th Cir. 2008); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). An employer can rebut a plaintiff's *prima facie* case by showing a valid, non-discriminatory reason for the employer's actions. *Atanus*, 520 F.3d at 672. A plaintiff can then survive summary judgment by presenting evidence that the proffered explanation is merely a pretext. *Id.* In this case, Garcia's membership in a protected class is undisputed, and Defendant acknowledges, as well, that suspensions and discharge constitute materially adverse employment actions. This case thus turns on whether Garcia met Defendant's legitimate expectations, and whether similarly situated employees received more favorable treatment.

Plaintiff's case does not survive either of these tests. Garcia did not meet Defendant's legitimate job expectations: he failed to complete any audits at all during the second half of 2009. The discharge consideration notice Plaintiff received specifically emphasized his failure to complete any audits and described problems in the quality of his work. Cerney also testified that he recommended Garcia's discharge to Hickey because Garcia "wasn't performing his job." (Cerney

Dep. 122:8-18.) Though Garcia's failure to complete any audits during the period was likely not the sole reason for his discharge, it was unquestionably a sufficient one.

Evidence that a supervisor set up an employee to fail can support a claim that an employer's reasons for adverse employment actions were pretextual. *Snelling v. Clarian Health Partners, Inc.*, 184 F. Supp.2d 838, 852 (S.D. Ind. 2002) (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In this case, however, there is no basis for a conclusion that the performance goals set by Defendant were unreasonable. Plaintiff's target for the second period of 2009 was twelve audits, fewer than he had completed in the previous six-month period. And Plaintiff's failure to complete any audits establishes that he would not have met even a lower target. While Plaintiff argues he was unable to complete audits because of his supervisors' actions, none of the listed obstacles–such as repeated revisions to his work, denied compensatory time and roll-over vacation time, and denied out-of-town travel—explain his failure to complete a single audit to his supervisor's satisfaction. Garcia's own comments reveal that the multiple revisions his supervisor demanded in the second half of 2009 were delayed by Garcia's substantive disagreements with supervisors over audits and policy: for example, he himself describes the delay resulting from his arguing with Drake over her review of the Real Time Systems file, and with Stewart over the Downtown Parking file. (May 4, 2010 Letter from Garcia to Hickey at D000030-31.)

The record before the court establishes no disputes of fact on this issue. Plaintiff did not meet Defendant's legitimate job expectations even without considering his inability to complete any audits in the second half of 2009. Plaintiff did have a "good" overall rating until June of 2009. But Plaintiff's ratings and disciplinary record show that he consistently failed to meet his employer's legitimate expectations for work quality and attitude over time, and he fails to present evidence beyond mere allegations that similarly situated employees were treated more favorably. *See Harris v. Warrick Cnty. Sheriff's Dept.*, 666 F.3d 444, 449 (7th Cir. 2012) (favorable treatment of employees who were allegedly similarly situated to plaintiff not evidence of discrimination if they did

not share "a comparable set of failings" with him) (quoting *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003)).

In spite of Plaintiff's allegations that Defendant unfairly evaluated his work, the question of Plaintiff's work performance is more than a mere "swearing contest." He cites *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353 (7th Cir. 1996), but that case bears little resemblance to this one. The plaintiff in that case had received a substantial raise just before he was fired, and the defendant had no documentary evidence that the plaintiff failed to meet legitimate expectations. Here, there is ample documentary evidence that, in spite of Plaintiff's positive scores on some evaluations, Defendant identified areas of dissatisfaction with Plaintiff's performance and communicated its dissatisfaction to Plaintiff by way of Performance Improvement Plans, evaluation comments, and disciplinary actions. Meeting an employer's legitimate expectations requires meeting its legitimate expectations in all areas, not merely the areas where an employee happens to excel. *See Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) (satisfactory performance in some evaluation categories not enough to meet employer's legitimate expectations when performance in other categories is unsatisfactory); *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) (fact that plaintiff met employer's legitimate expectations in the past is irrelevant to question of whether he is currently meeting expectations). Plaintiff's comments in response to his evaluations and his other communications with supervisors demonstrate his awareness of Defendant's complaints about his poor performance. As evidence that he met legitimate expectations, Plaintiff thus offers nothing more than his belief that the expectations Defendant communicated to him were not legitimate.

Plaintiff acknowledges that to qualify as a similarly situated employee who is treated more favorably, a comparator must deal with the same supervisor, be subject to the same standards, and engage in similar conduct as a plaintiff or have mitigating circumstances that distinguish his conduct or an employer's treatment of him. (Pl.'s Resp. at 12.) Garcia lists twelve non-Mexican employees

31

and ten employees under 40 years old who he argues meet this description. Garcia contends that he shared common decision-makers and was subject to the same standards as these employees, though they had different immediate supervisors and job titles. (Pl.'s Resp. at 13.) But Plaintiff offers no evidence that any employee treated more favorably than Garcia possessed a similar history of unsatisfactory performance evaluations, disciplinary notices, or attitude problems. The information Garcia provides about other employees' performance and disciplinary outcomes is fragmented and incomplete. For example, Garcia's only evidence of favorable treatment in disciplinary actions is that some employees received lesser sanctions than Garcia did for violations of the same Personnel Rule sub-section (Pl.'s Resp. at 12-13)—a "fact" that ignores the many violations of other Rule sub-sections in Garcia's record and listed on his discharge notice.

Garcia also complains that he was not promoted as quickly to Auditor II as another employee who brought in less money via assessments than Garcia did in collections. (Garcia Dep. 150:2-24.) If that incident were properly before the court at all (it occurred in 2004 or 2005, long prior to Plaintiff's first EEOC charge), the claim would have no merit. There is no admissible evidence of the amount of money brought in by any of Plaintiff's co-workers, that the amount of money brought in was an approved measure of employee success, or that collections work and assessment work would be expected to yield similar amounts of revenue. More importantly, Plaintiff fails to provide any meaningful details at all about how and when promotion decisions were made, who made them, or how the successful candidates' performance compared with his own. There is, in short, no evidence that similarly-situated employees outside of Garcia's protected classes received more favorable treatment.

For similar reasons, even if Plaintiff had made a *prima facie* case of discrimination, he still could not establish that Defendant's reasons for suspending and terminating him were pretextual. *See Coleman v. Donahoe*, 667 F.3d 835, 857-58 (7th Cir. 2012) (pretext inquiry and similarly situated inquiry are not hermetically sealed off from each other). Plaintiff's positive evaluations

before 2009, his belief that other employees who violated the same Personnel Rules were not disciplined as severely, his frustration that other employees were promoted ahead of him, and conflicting testimony about Garcia's interactions with other members of the office, do not present sufficient evidence that Defendant lied about its reasons for suspending and terminating Garcia. *See Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673 (7th Cir. 2001) (triable issue concerning pretext requires a showing that defendants lied about the reasons for adverse action or that their stated reasons have no basis in fact). Nor is there any basis in this record to question Defendant's failure to promote Plaintiff. *See Hobbs*, 573 F.3d at 462 (only if differences between employees were "so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue" is pretext shown) (internal quotation marks and citations omitted); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) (plaintiff's subjective belief that she was better qualified than person hired was insufficient to demonstrate pretext). Defendant's assessments of Plaintiff's work performance and conduct were not pretextual, so long as Defendant honestly believed the reasoning it offered. *Coleman*, 667 F.3d at 852-53. Plaintiff has not provided adequate evidence for a *prima facie* case of discrimination under the indirect method.

### B. Retaliation

Title VII and § 1981 also prohibit retaliation against an employee for participation in protected activities. *See, e.g., Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Like discrimination, retaliation may be established by either the direct or indirect methods. *Coleman*, 667 F.3d at 859. Plaintiff here argues only under the direct method, requiring him to establish (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Id.* at 859.

The parties agree that Garcia engaged in protected activity. They also agree that Garcia suffered adverse employment actions under the "more generous" standard for retaliation claims. *Volovsek*, 344 F.3d at 688 n.5. An adverse action under the retaliation analysis "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) (internal quotation marks and citations omitted).

Defendant argues, however, that Plaintiff's 29-day suspension and his "unsatisfactory" evaluation rating for the second half of 2009 are not actionable as adverse employment actions under a retaliation theory because they exceed the scope of his administrative charges. (Def.'s Mem. at 2-4.) Plaintiff urges the court to overrule this objection. He notes that the law does not require him to include in his EEOC charge "each and every fact that combines to form the basis of each claim in [his] complaint," *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992), so long as the claims in the complaint are "'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citing *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976)).

Retaliation and discrimination charges are generally not considered like or reasonably related to one another, however. *Moore v. Vital Products, Inc.*, 641 F.3d 253, 257 (7th Cir. 2011) (discriminatory discharge claims not like or reasonably related to hostile work allegations); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544-45 (7th Cir. 1988) (retaliation claims not like or reasonably related to age discrimination claims). Plaintiff cites *Jenkins*, where the Seventh Circuit, acting *en banc*, held that an EEOC charge asserting denial of promotion after an employee began wearing an Afro hairstyle supported wider-ranging allegations of race discrimination. *Jenkins* loosens the requirement that all bases for a race discrimination claim be specifically identified in

an EEOC charge; it does not render a retaliation claim "like or reasonably related to" a national origin discrimination claim.

Garcia did allege that Pekic and Cerney retaliated against him in discipline leading up to his discharge. Even assuming that includes the 29-day suspension, Plaintiff's retaliation claim fails because he has not established a causal connection between his protected activity and any adverse employment actions. Suspicious timing, ambiguous statements, evidence that similarly situated employees were treated differently, and evidence that an employer offered a pretextual reason for adverse employment action are possible circumstantial evidence of retaliation under the direct method. *Id.* at 860. Garcia makes much of the discovery of a copy of his January Charge on his office chair—but he filed that charge after the suspension was imposed, and had already completed the suspension by the time he discovered the suspicious envelope. Nothing about that discovery casts a cloud over the motivation for the 29-day suspension. Instead, Garcia offers only "pure speculation" to establish that retaliation caused the treatment about which he complains. *Haywood*, 323 F.3d at 532 (quoting *Lalvani v. Cook Cnty.*, 269 F.3d 785, 791 (7th Cir. 2001)). His supervisors' expressions of annoyance about Garcia's allegations against them, documented in their e-mails and evaluation comments, would be troublesome if there were no evidence that his performance justified the criticisms. But Garcia has not presented actual or even circumstantial evidence that Defendant's stated reasons for his suspensions, evaluations, workplace treatment, or firing were pretextual. *See Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, 651 F.3d 664, 675 (7th Cir. 2011) (no causation where plaintiff "completely ignores the elephant in the room: the questionable transaction in which he engaged" in asserting that the proximity of his protected activity to his termination implies retaliation). Defendant's well-documented evaluations of Garcia under multiple supervisors from 2003 until 2009 show escalating and broad-ranging problems with Garcia's conduct and his attitude. Defendant thus provides "unrebutted evidence"

that any retaliatory motive for adverse employment actions was not a but-for cause of Garcia's suspension and termination. *Haywood*, 323 F.3d at 531.

###### C.        Hostile Work Environment

In addition to his specific complaints, such as being denied promotion, Plaintiff alleges chronic, wide-ranging mistreatment by Defendant, including hostility and false attacks from supervisors. A pattern of mistreatment may appropriately be considered under a hostile work environment theory. But Plaintiff is wrong to argue that any ongoing pattern of harassment he may have suffered meets the high standard for proceeding under that theory: a "workplace permeated with discriminatory ridicule, intimidation, and insult." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). A hostile work environment claim's survival through summary judgment depends on evidence that the plaintiff was harassed based on membership in a protected category and that the harassment was severe or pervasive, involving conduct that was both objectively and subjectively hostile toward a plaintiff. *Id.* Hostility must go beyond "sporadic use of abusive language" lest Title VII become a "general civility code." *Vance v. Ball State Univ.*, 646 F.3d 461, 472 (7th Cir. 2011) (quoting *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998)).

The evidence Plaintiff offers does not meet this high standard. Garcia's complaints that his supervisors were impatient or disparaging toward him are better classified as among "those petty slights or minor annoyances that often take place at work." *Henry v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). Garcia's claims that he was unfairly criticized by supervisors and that his legitimate complaints were ignored by management are also not sufficiently severe or pervasive to support a hostile work environment claim. *See, e.g., Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 339 (7th Cir. 2002) ("rude, abrupt, and arrogant" supervisor who subjected employee to "stern and severe criticism" not enough for hostile environment). The escalating conflict between Plaintiff and Defendant that ended in Plaintiff's termination was unpleasant for Plaintiff, but, even

construing the facts in the light most favorable to him, it did not rise to the level of a hostile work environment.

Most importantly, Plaintiff offers no evidence that any harassment he claims to have suffered related in any fashion to his national origin or age. Plaintiff admits that Defendant never made any clearly derogatory comments based on his protected statuses, and fails to provide evidence that any City employee ever made reference to Garcia's national origin or age as the basis of his or her criticisms of Garcia. Despite the repeated, lengthy, and explicit feedback from supervisors about problems with Garcia's work and directions for improvement, Garcia concludes that "there's really no conclusion that I could come up with" to explain his difficulties with Defendant "except that . . . people in the department had something against me . . . because of my national origin." (Garcia Dep. 211:7-14.) He fails to offer evidence that other workers whose performance was similar were not criticized, largely because he fails to offer meaningful information about other workers' performance at all. That Garcia had a difficult relationship with several of his supervisors is not sufficient evidence that Garcia was singled out for hostility based on his national origin or age. Because Plaintiff does not offer evidence of a hostile workplace, the parties' dispute about whether Plaintiff adequately notified Defendant about the harassment he claims to have suffered is irrelevant.

Garcia is undoubtedly correct that his supervisors had "something against" him by the time he was discharged. He had absorbed considerable time and attention, had been placed on one Performance Improvement Plan after another, and had stubbornly refused to accept criticism from any of the many supervisors who had concerns about his teamwork and his attitude. Supervisors were entitled to hold these things against him, where, as in this case, there is no evidence that his supervisors' concerns were motivated in any way by Garcia's age or national origin.

**CONCLUSION**

Defendant's motion for summary judgment [104] is granted.

ENTER:

Dated: November 5, 2012

_____
REBECCA R.  PALLMEYER
United States District Judge